# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| ORTIZ GLAZE, | ) | |
| | ) | |
| Plaintiff, | ) | No. 14 C 3120 |
| | ) | |
| v. | ) | Judge Amy St. Eve |
| | ) | |
| CITY OF CHICAGO, et al. | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

The Court, in its discretion, denies Defendant City of Chicago's motion to bifurcate and stay discovery and trial [43]. Status hearing set for 10/28/14 is stricken and reset to 10/7/14 at 8:30 a.m.

## STATEMENT

On May 22, 2014, Plaintiff Ortiz Glaze brought the present sixteen-count First Amended Complaint against Defendants City of Chicago and certain Chicago police officers alleging constitutional violations and state law claims, including a claim against the City under *Monell v. Dep't of Soc. Servs. of the City of N.Y.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Before the Court is the City's motion to bifurcate Glaze's *Monell* claim from his other constitutional claims for discovery purposes and trial. *See* Fed. R. Civ. P. 42(b). For the following reasons, the Court, in its discretion, denies the City's motion.

## LEGAL STANDARD

Federal Rule of Civil Procedure 26 provides federal district courts with broad discretion to tailor the sequence of discovery, especially when a plaintiff files a complaint against public officials. *See Crawford-El v. Britton,* 523 U.S. 574, 597-98, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998); *see also Bond v. Uteras,* 585 F.3d 1061, 1075 (7th Cir. 2009). Under Rule 42(b), the Court may bifurcate issues for trial or discovery if the separation prevents prejudice to a party or promotes judicial economy. *See Chlopek v. Federal Ins. Co.,* 499 F.3d 692, 700 (7th Cir. 2007). Whether to bifurcate discovery or trial is a decision committed to the district court's sound discretion and is made on a case-by-case basis. *See Volkman v. Ryker*, 736 F.3d 1084,1088-89 (7th Cir. 2013); *Krocka v. City of Chicago,* 203 F.3d 507, 516 (7th Cir. 2000). Bifurcation is the exception, not the rule, and the City bears the burden of demonstrating that concerns of judicial economy or prejudice weigh in favor of the Court bifurcating *Monell* discovery and trial. *See Trading Tech. Int'l, Inc. v. eSpeed, Inc.*, 507 F.Supp.2d 870, 871 (N.D. Ill. 2007); *Real v. Bunn–O–Matic Corp.,* 195 F.R.D. 618, 620 (N.D. Ill. 2000).

GROUP EXHIBIT A

## BACKGROUND

### I.     Allegations Against Defendant Officers

In his First Amended Complaint, Glaze alleges that he spent the morning and early afternoon of April 30, 2013 preparing for a gathering and cook-out that took place on the 88th block of South Burley Avenue in Chicago. (R. 10, First Am. Compl. ¶ 10.) The cook-out, commemorating a deceased friend, included entertaining over fifty friends, family members, and neighbors of the deceased of all ages. (*Id*. ¶¶ 10, 11). At around 9:00 p.m., a group of Defendant Officers arrived in three police cars traveling north on South Burley Avenue. (*Id*. ¶ 14.) After exiting an unmarked police car, Defendant Jones fired his gun — possibly as a warning shot. (*Id*. ¶ 17.) Startled by the gunshot and the arrival of numerous police officers, the crowd began to disperse and/or run away, including Glaze. (*Id*. ¶¶ 17, 24.)

Defendant Jones chased Glaze on foot and fired shots at him. (*Id*. ¶ 18.) Also, Defendant Garcia chased Glaze in the unmarked police car, caught up with him just a few moments later, and exited his squad car. (*Id*. ¶ 19.) Defendant Garcia then fired multiple shots at Glaze. (*Id*.) In total, Defendant Officers fired at least ten bullets at Glaze, two of which struck Glaze in the back of his upper left arm and the back of his left thigh causing him to fall to the ground. (*Id*. ¶ 20.) According to Glaze, at the time Defendant Officers shot him, he was unarmed, did not reach for his waistband, was not pointing anything, and did not pose a threat to the officers. (*Id.* ¶ 21.)

Defendants Jones and Garcia were the first two people to reach Glaze after the shooting. (*Id*. ¶ 22.) Because Glaze's left arm had been immobilized by the gunshot wound, Defendants Jones and Garcia handcuffed Glaze's right hand to his belt loop. (*Id*.) Defendant Garcia searched Glaze and did not recover a weapon. (*Id*. ¶¶ 22, 23.) Defendant Officers then arrested Glaze and sent him via ambulance to the hospital for treatment of his gunshot wounds. (*Id*. ¶¶ 24, 25.) Glaze remained in custody while at the hospital where Defendant Officers kept him restrained. (*Id*. ¶¶ 25, 26.) Defendant Officers also confiscated and inventoried Glaze's belongings, including an iPhone, state identification card, keys, and money. (*Id*. ¶ 27.) When Defendant Officers returned his belongings, a sum of money was missing. (*Id*. ¶ 28.)

Glaze further alleges that Defendant Officers knew that he did not commit a crime and that there was no probable cause to support any criminal charge against him, but nonetheless pursued criminal charges against him to cover up the unjustified shooting. (*Id*. ¶ 30.) To that end, Defendant Officers attempted to persuade the Felony Review Unit of the Cook County State's Attorney's Office to seek felony charges against Glaze, falsely claiming that Glaze had threatened Defendants Jones and Garcia. (*Id*. ¶ 31.) The Felony Review Unit reviewed Glaze's case the day after the shooting and declined to file felony charges. (*Id*.) Nevertheless, Defendant Officers falsely charged Glaze with four misdemeanor offenses — aggravated assault of Defendants Jones and Garcia and resisting and obstructing Defendants Jones and Garcia. (*Id*. ¶ 32.) In support of the charges, various individual defendants claimed that each series of shots that the officers fired at Glaze had been preceded by Glaze reaching into his waistband and

making threatening movements with his right arm. (*Id*. ¶ 33.) Various Defendant Officers, including Jones and Garcia, stated that Glaze held a firearm in his right hand describing the gun as a semi-automatic firearm. (*Id*. ¶ 34.) Glaze alleges that these statements were fabricated and that Defendant Officers did not recover a gun from him during their search of him. (*Id*. ¶¶ 35, 36.)

Furthermore, Glaze maintains that realizing they needed a plausible explanation for shooting him in the back, various Defendant Officers conspired to plant a second cell phone on him and then falsely claimed that they had recovered the silver Samsung phone from him at the hospital. (*Id*. ¶ 39.) Defendant Officers did not inventory the Samsung phone at the same time as the other items recovered from Glaze. (*Id*.) Instead, Defendant Connolly falsely claimed that the Samsung phone had appeared without explanation on top of a pile of Glaze's clothing in his hospital room. (*Id*.) Thereafter, Defendant Connolly claimed that the silver Samsung phone could have been the object that Glaze supposedly brandished at Defendants Jones and Garcia, prompting them to shoot him. (*Id*.) At his trial on March 5, 2014, Defendant Officers Jones, Garcia, Toth, Connolly, and Kalicki testified against him, and according to Glaze, they provided false testimony. (*Id*. ¶ 41.) Glaze was acquitted of all charges. (*Id*.)

## II. Monell Allegations

Glaze alleges that the Chicago Police Department ("CPD") has a policy and practice regarding police shootings of civilians, including inadequate training, supervision, post-incident review, and discipline. (*Id*. ¶ 43.) Further, Glaze maintains that these policies and practices directly caused Defendant Officers' unlawful conduct. (*Id*.) In support of these allegations, Glaze points to the number of shootings by Chicago police in the past few years. (*Id*. ¶ 45.) Specifically, Chicago police shot 61 people in 2009, killing 19; 46 people in 2010, killing 13; 60 people in 2011, killing 23; and 57 people in 2012, killing 8, according to Officer-Involved Shooting Annual Reports, Independent Police Review Authority. (*Id*.) In addition, 75% of those shot by CPD officers between 2009 and 2013 have been African-American, with African-American residents over ten times more likely to be shot than white residents. (*Id*. ¶ 46.) Also, Glaze contends that Chicago police officers shoot far more residents annually than officers in any other city in the United States and provides statistics in support of this contention. (*Id*. ¶¶ 47, 48.)

Moreover, Glaze asserts that the unacceptable number of police shootings in Chicago results from the City's inadequate policies and practices, including a lack of any meaningful training or supervision on the use of deadly force against people fleeing from police officers. (*Id*. ¶ 49.) In addition, Glaze contends that the Chicago Police Department rarely undertakes a meaningful review when its officers shoot people and almost never disciplines any officers in connection with shootings. (*Id*. ¶ 50.) Instead, the Independent Police Review Authority has exonerated CPD officers who shoot Chicago residents in over 99% of cases, regardless of the actual circumstances of the shooting, as did its predecessor, the CPD Office of Professional Standards. (*Id*.) Since 2000, the City of Chicago has not found any police shooting by a CPD officer to have been unjustified. (*Id*.)

## ANALYSIS

In its motion, the City argues that the "prosecution and defense of Plaintiff's multiple and sprawling *Monell* claims — which will involve 'colossal' fact discovery, expert discovery, dispositive motion practice, and perhaps trial — threatens completely to overwhelm what already is a complex Section 1983 action against eighteen individual defendants, to the detriment of the parties, the court, and the judicial process itself." First, despite the City's argument to the contrary, Glaze's *Monell* claim is more precise than the City portrays. In short, Glaze is basing the City's liability on the theory that the City failed to properly train, supervise, review, and discipline its police officers, especially in the use of deadly force against individuals fleeing the police. *See Connick v. Thompson,* \_\_\_ U.S. \_\_\_, 131 S.Ct. 1350, 1359, 179 L.Ed.2d 417 (2011) ("In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983."); *see also Canton v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); *Sornberger v. City of Knoxville, Ill.,* 434 F.3d 1006, 1029-30 (7th Cir. 2006).

Citing to *Los Angeles v. Heller,* 475 U.S. 796, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986), the City also argues that bifurcation allows the City to avoid burdensome and potentially unnecessary discovery and litigation costs should Plaintiff fail to establish a constitutional violation, and thus, as a matter of law, be unable to prove any *Monell* violation. It appears that the City is arguing that because its liability is contingent on the individual officers' liability, the Court should allow the parties to address the claims against the individual officers first. The Seventh Circuit, however, has rejected the argument that the individual officers' liability is a predicate to finding municipality liability in *Thomas v. Cook County Sheriff's Dep't,* 604 F.3d 293, 305 (7th Cir. 2010) ("a municipality *can* be held liable under *Monell*, even when its officers are not, unless such a finding would create an inconsistent verdict.") (emphasis in original). In this District, many courts relied on *Heller* in granting bifurcation motions under similar circumstances prior to the *Thomas* decision. *See, e.g., Medina v. City of Chicago,* 100 F.Supp.2d 893, 895 (N.D. Ill. 2000). Since the Seventh Circuit decision in *Thomas*, however, courts in this district are reluctant to grant bifurcation motions on this basis alone. *See Awalt v. Marketti,* No. 11 C 6142, 2012 WL 1161500, at *10 n.2 (N.D. Ill. Apr. 9, 2012) (after *Thomas*, "[i]t is clear that the weight of authority holds that bifurcation is now heavily disfavored") (collecting cases); *see also Bell v. City of Chicago*, No. 09 C 4537, 2010 WL 432310, at *2 (N.D. Ill. Feb. 3, 2010).

The City's judicial economy and prejudice arguments fare no better in this case. Under the circumstances, bifurcation would result in two rounds of discovery, two rounds of dispositive briefing, and two trials that would most likely involve the same witnesses and evidence. *See Awalt,* 2012 WL 1161500, at *12. Indeed, piecemeal litigation involving the claims against the eighteen Defendant Officers and the City would delay proceedings in this case, especially because Glaze alleges an extensive cover-up as part of both his *Monell* and constitutional claims against the individual officers. *See Obrycka v. City of Chicago,* 913 F.Supp.2d 598, 600 (N.D. Ill. 2012). Further, the City's prejudice argument that the jury would be confused by the

evidence is best cured by proper jury instructions and evidentiary challenges — not by restricting discovery.

      For these reasons, the Court, in its discretion, denies Defendant's motion to bifurcate.

**Dated:** September 19, 2014

                                      **AMY J. ST. EVE**
                                      **United States District Court Judge**

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Robert M. Dow, Jr. | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 08 C 627 | **DATE** | 9/16/2010 |
| **CASE TITLE** | Hughes, et al. vs. City of Chicago, et al. | | |

**DOCKET ENTRY TEXT**

Before the Court is Defendants' joint motion to bifurcate and enter a certification on Plaintiffs' remaining *Monell* claim [130]. For the reasons stated below, the motion [130] is respectfully denied without prejudice.

■[ For further details see text below.]

Docketing to mail notices.
*Copy to judge/magistrate judge.

# STATEMENT

**I.   Background**

Because the circumstances leading to the filing of Defendants' joint motion to bifurcate and enter a certification on Plaintiffs' remaining *Monell* claim [130] are somewhat complex, the Court will summarize them briefly.

In a September 2009 minute order [100], the Court set a February 2010 trial date in this matter. After setting that date, the Court discovered in the process of working through Defendants' motion for partial summary judgment [77] an issue relating to Plaintiffs' *Monell* claim that, in the Court's view, raised the prospect of additional discovery and a second round of summary judgment briefing. Specifically, in their response in opposition to Defendants' motion, Plaintiffs relied on deposition testimony elicited in another case involving Defendant City of Chicago, *Daniels v. City of Chicago*, No. 08-cv-6832 (N.D. Ill.), that Plaintiffs contend contradicted the City's written discovery responses in this case and raised a genuine issue of material fact as to the City's policies concerning field test kits. In their reply brief on summary judgment, Defendants objected to the consideration of the deposition testimony from the *Daniels* case.

In its November 25, 2009 memorandum opinion and order [103, at 15-18], the Court noted the dearth of legal authority in support of a *Monell* claim for inadequately training police officers on conducting narcotic field tests. But before addressing the viability of Plaintiffs' legal theory, the Court addressed Defendants' contention that Plaintiffs lacked any admissible evidence. As the Court explained, under the pertinent case law, Plaintiffs bore the burden of showing that the deposition testimony from the *Daniels* case was admissible at summary judgment. The Court requested supplemental briefing on that issue, as well as on Defendants' contentions that the deposition testimony should be excluded as untimely and unfairly prejudicial.

## STATEMENT

In a minute order dated December 21, 2009 [113], the Court overruled the City's blanket objection to consideration of the deposition testimony in view of the similarity of the parties and issues and the potential discrepancy between the testimony of the officers in the two cases. However, to avoid any prejudice to Defendants from the consideration of that evidence – which was discovered after the close of fact discovery and after Defendants filed their motion for summary judgment – the Court ruled that the City should be entitled (1) to take additional discovery on the issue of narcotics field tests and (2) to file a renewed motion for summary judgment if, at the end of the additional period of discovery, it felt that it was entitled to judgment as a matter of law under Rule 56. At the same time, given the then-impending trial date, the Court bifurcated the *Monell* claim and reopened its referral of discovery supervision to Magistrate Judge Cox so that the parties could efficiently tie up any loose ends in regard to the *Monell* discovery.

In early January, Judge Cox held a status hearing and extended the deadline for *Monell* discovery to March 9, 2010. The following day, Plaintiffs filed a motion [120] requesting that this Court move the trial date so that all claims could be tried together. In an oral ruling on January 12, the Court granted Plaintiffs' motion [125] in part. The Court began by expressing the view that it makes sense to decide whether to bifurcate *Monell* claims either at the very beginning of a case (where efficiency concerns may counsel in favor of bifurcation both for discovery and trial) or toward the end of the case, just prior to trial, at which time everyone has a reasonably clear picture of the issues to be tried and any prejudicial effects of trying all of the claims, including those under *Monell*, at the same time. See 1/12/10 Tr. at 2. The Court also indicated that although it was inclined on the then-current state of the record to have a single trial, it also was "inclined to put off the bifurcation issue until the very end" to allow the further discovery and potential renewed summary judgment motion to run their course. *Id*. at 3. As the Court concluded, "I'm not going to resolve the bifurcation issue until I see the whole picture again" in order to make an informed judgment as to (1) whether there would be a triable *Monell* claim and (2) if so, whether that claim should be part of a single trial or bifurcated. *Id*. at 6.

The parties then appeared before Judge Cox again on March 9, at which time the parties advised that they needed additional time to agree on a discovery plan for the *Monell* claims. On March 18 and March 24, the parties appeared before Judge Cox and this Court, respectively, at which time Defendants advised both judges that they planned to file a motion for a stipulation that, if entered, might obviate the need to move forward on the *Monell* claim at this time. In view of Defendants' representation, Judge Cox indicated that she would await this Court's ruling on Defendants' motion asking for entry of a stipulation on the *Monell* issues before "tak[ing] up the issue of what discovery, if any, is appropriate" on the remaining *Monell* matters. 3/18/10 Tr. at 4. Although Defendants suggested at the March 24 status hearing that the motion would be filed later that day (3/24/10 Tr. at 3), it actually was not filed until almost a month later, on April 22. The Court took full briefing on the motion, which now is ready for decision.

II.     **Analysis**

In the motion, Defendants contend that the Court's ruling – that the parties proceed with discovery and any further motion practice on the *Monell* issue – would unduly complicate this case and unduly prejudice the defendants in the *Daniels* case. Plaintiffs counter that keeping the *Monell* issues on track for further development is the more efficient course at this time and that Defendants' focus on the *Daniels* case is simply a distraction.

On the basis of the testimony in *Daniels*, Plaintiffs contend that Defendants' oral and written representations concerning the existence of field drug tests were "false." Defendants dispute that characterization and, in fact, insist that the deposition testimony in *Daniels* indicates that Defendants' prior representations in this case were correct. The essence of the Court's December 21, 2009 ruling was that Plaintiffs in the *Hughes*

## STATEMENT

case could designate (after the discovery deadline) new witnesses on the issue of field testing in view of the fact that the witnesses (which since have been designated) are City of Chicago police officers whose testimony *may have* contradicted the positions taken on the same issue by other City of Chicago police officers in this case. And all that the Court anticipated in reopening discovery was giving Defendants an opportunity to further develop the facts relating to Plaintiffs' contentions and to file a renewed motion for partial summary judgment if warranted.

Defendants contend that the additional *Monell* discovery "threatens to completely consume" this case and that a trial including the *Monell* claims would "dwarf" the shorter trial that Defendants anticipate on the non-*Monell* claims against the individual Defendants. As to the former, the Court is hard pressed to see how Defendants' position could be correct. Plaintiffs have designated only two additional witnesses on the sole issue (field testing) as to which further discovery may be warranted. Those witnesses – Officers Nunez and O'Grady – are the individuals whose testimony in the *Daniels* case, Plaintiffs contend, contradicts the testimony given in this case on the City's policies. Plaintiffs have not designated any experts on the field testing issue. Moreover, both Nunez and O'Grady are employees of the City of Chicago, and thus the need for the City itself to depose those witnesses – as opposed to simply interviewing them – is unclear at this point. Defendants have raised the specter of designating and deposing additional witnesses, but they have not convincingly demonstrated who among the nine other witnesses who have been deposed in the *Daniels* case *would* (as opposed to *might*) be designated in this case and why their testimony would be pertinent. Defendants also assert prejudice on the basis of concerns about "unilateral discovery" and shifting burdens of proof, but neither of those arguments is persuasive, either. In its November and December 2009 orders [103, 113], the Court outlined the pertinent legal standard and addressed Defendants' objections concerning Plaintiffs' proposed use of the testimony elicited in the *Daniels* case. And after taking supplemental briefing from the parties specifically on that issue, the Court concluded [see 113, at 2] that, especially in view of the similarity of the parties and the issues, the evidence was relevant to the City's policies and training (or lack thereof) on field testing. The Court further concluded that Defendants would be given an opportunity to "conduct additional discovery on the issue of narcotics test kits," as they had requested [106, at 9], in the event that the Court was inclined to consider the new evidence and did not grant summary judgment for Defendants on the *Monell* claim in any event. And as to Defendants' "burden of proof" concerns, from the Court's perspective, the only burden that Defendants have in regard to the field testing issue at this time is to demonstrate, if they can, the absence of a genuine issue of material fact if they wish to defeat Plaintiffs' *Monell* claim at summary judgment – which, after all, is the context in which this side skirmish developed. After the Court's November 25 order spotted the issue, the Court's December 21 order determined that the deposition testimony could be considered in opposition to Defendants' summary judgment motion, but only in the context of further factual developments that Defendants may wish to undertake in support of the contention that, notwithstanding the deposition testimony, summary judgment still is appropriate on the *Monell* claim.

For all of these reasons, the Court is unconvinced that stopping the *Monell* discovery in its tracks is necessary to avoid either unduly complicating this case or prejudicing anyone in this case or the *Daniels* case. The Court remains of the view that the best course for the management of this case is as follows: (1) complete *Monell* discovery (under Magistrate Judge Cox's supervision); (2) determine whether a renewed motion for summary judgment on the *Monell* claim is appropriate (and, if so, resolve that motion); and (3) determine, after discovery is complete and further dispositive motions (if any) have been resolved, whether bifurcation of the *Monell* issue at trial is appropriate. That is the course that the Court attempted to set earlier this year, and the Court is not persuaded to derail that course through the entry at this time of a bifurcation order and a stipulation along the lines proposed by Defendants. As a final matter, the Court reiterates that, contrary to the tenor of both parties' submissions on the instant motion, the Court has not definitively ruled on the

bifurcation issue and does not intend to do so until after any further *Monell*-related discovery and motion practice is complete.

III.     Conclusion

For the reasons stated above, Defendants' joint motion to bifurcate and enter a certification on Plaintiffs' remaining *Monell* claim [130] is respectfully denied without prejudice.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |  |
|---|---|---|
| RANDOLPH TROY HARPER, SR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| SHERIFF THOMAS DART, in his official capacity; COOK COUNTY, ILLINOIS d/b/a CERMAK HEALTH SERVICES OF COOK COUNTY; MICHAEL PUISIS, in his official capacity; DR. AVERY HART, in his official capacity; DR. JAMES S. KAPOTAS; DR. Y. YU; DR. N. ALI; and other unidentified employees of COOK COUNTY JAIL. | ) ) ) ) ) ) ) ) ) ) | 10 C 3873 |
| Defendants. | ) | |

## MEMORANDUM OPINION

CHARLES P. KOCORAS, District Judge:

This case comes before the Court on the motion of Defendants Cook County d/b/a Cermak Health Services of Cook County ("Cermak"), Dr. Avery Hart, Dr. Michael Puisis, Dr. James Kapotas, Dr. Yan Yu, and Dr. Nagib Ali (collectively, "Defendants") to dismiss Plaintiff Randolph Harper's ("Harper") Third Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons stated below, Defendants' motion is denied.

## RELEVANT FACTS

For purposes of the motion to dismiss, we accept the allegations of the Complaint as true. *Warth v. Seldin*, 422 U.S. 490, 501 (1975). Since November 10, 2009, Harper has been incarcerated as a pre-trial detainee in the Cook County Department of Corrections ("Cook County Jail"). Because of a physical handicap, Harper walks with a cane and has obtained permission to use his cane at Cook County Jail. On or about November 27, 2009, several officers, without explanation, confiscated Harper's cane. Three days later, on November 30, 2009, Harper slipped and fell, hitting his collarbone on a sink and fracturing his left wrist. Harper visited the in-house medical facility, the dispensary, to obtain medical attention for his injuries. Dr. Yu rubbed Harper's wrist and stated that nothing was wrong. Dr. Yu did not examine Harper's collarbone. Harper then visited Cermak, which provides medical services to inmates detained at Cook County Jail. At Cermak, Dr. Kapotas examined Harper and said nothing was wrong with Harper's wrist. Dr. Kapotas did not order any x-rays and did not examine Harper's collarbone.

On December 10, 2009, December 18, 2009, December 19, 2009, and December 24, 2009, Harped filed detainee grievances, complaining of pain in his wrist. On several occasions, Harper visited the dispensary and was seen by either Dr. Yu or

Dr. Ali who never performed an x-ray, but continuously maintained that nothing was wrong with Harper's wrist.

On or about February 25, 2010, 87 days after Harper's injury, Dr. Kapotas ordered an x-ray of Harper's wrist. A radiologist found that Harper's wrist was fractured. Even though Harper's wrist was fractured, Dr. Kapotas did not place a splint on Harper's wrist until approximately five days later. Dr. Kapotas recommended that Harper see an orthopaedic hand specialist.

On March 24, 2010, Harped filed a detainee grievance, complaining that he was being denied access to an orthopaedic hand specialist and that his collarbone was causing him pain and had not been x-rayed. On April 12, 2010, Harper's grievance was denied by Cook County. As of the date of Harper's Complaint, no doctor had examined or x-rayed Harper's collarbone.

On April 15, 2010, Harper returned to Cermak and Dr. Kapotas removed the splint, took x-rays of Harper's wrist, and stated that Harper's wrist was fully healed. The next day, Harper visited a hand specialist who determined, contrary to Dr. Kapotas's finding, that Harper's wrist was not healed and required surgery. The doctors put a cast on Harper's wrist and scheduled him for surgery on June 24, 2010. For reasons unknown to Harper, the staff at Cook County Jail did not bring Harper to his scheduled surgery. On September 2, 2010, Harper had surgery on his wrist.

In December 2010, Harper frequently complained of wrist pain. After three weeks of agonizing pain, on December 27, 2010, Harper went to the dispensary and then to Cermak because the rods in his wrist had punctured his skin. Harper again had surgery on his wrist and, as of the date of Harper's Complaint, Harper's wrist had not healed properly.

On March 3, 2011, Harper filed his Third Amended Complaint against Defendants Sheriff Dart, Cook County d/b/a Cermak, Dr. Puisis (Cermak's Chief Operating Officer), Dr. Hart (Cermak's Chief Medical Officer), Dr. Kapotas, Dr. Yu, Dr. Ali, and other unidentified employees of Cook County Jail, alleging claims for inadequate medical treatment under 42 U.S.C. § 1983. On March 30, 2011, Defendants Cook County, Cermak, Dr. Puisis, Dr. Hart, Dr. Kapotas, Dr. Ali, and Dr. Yu filed a motion to dismiss Harper's claims.

## LEGAL STANDARD

A pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 8 does not require detailed factual allegations, but requires more than a formulaic recitation of the elements of a cause of action. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To survive a motion to dismiss, the complaint must contain sufficient facts to state a claim for relief that is plausible on its face. *Id.* at 570. In ruling on a motion to dismiss,

a court must accept the well-pleaded allegations in the complaint as true, construe the allegations of the complaint in the light most favorable to the plaintiff, and draw all reasonable inferences in favor of the plaintiff. *Hentosh v. Herman M. Finch Univ. of Health Scis./The Chi. Med. Sch.*, 167 F.3d 1170, 1173 (7th Cir. 1999).

## DISCUSSION

### I.     Count I Against Drs. Yu, Ali, and Kapotas

Pre-trial detainees have a right to adequate medical care under the Fourteenth Amendment. *Mayan v. Weed*, 310 F.App'x 38, 40 (7th Cir. 2009). To succeed on a claim for inadequate medical care, a plaintiff must prove that he or she had a serious medical need and that the defendant was deliberately indifferent to that need. *Id.* at 41. To prove deliberate indifference, the plaintiff must show that the defendant was aware of facts from which he or she could infer a substantial risk of serious harm and that the defendant actually drew that inference. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). In other words, the plaintiff must demonstrate that the defendant acted or failed to act despite his or her knowledge of a substantial risk of serious harm. *Id.* at 842. Significantly, negligence, gross negligence, or even medical malpractice do not constitute deliberate indifference. *Mayan*, 310 F.App'x at 41. Moreover, the plaintiff's mere dissatisfaction or disagreement with a course of treatment is insufficient. *Id.*

Defendants acknowledge that Harper has plead facts sufficiently demonstrating a serious medical need, but argue that Harper's claim fails because Harper has not alleged facts sufficient to evidence Drs. Yu's, Ali's, and Kapotas's deliberate indifference.

At the pleading stage, a plaintiff need only generally allege that a defendant had knowledge of a substantial risk of serious harm. *Burks v. Raemisch*, 555 F.3d 592, 594 (7th Cir. 2009) (noting that, without discovery, the plaintiff could not plead knowledge with specificity). "A prisoner's statement that he repeatedly alerted medical personnel to a serious medical condition, that they did nothing in response, and that permanent injury ensued, is enough to state a claim on which relief may be granted." *Id.* The medical personnel's failure to act may be simple negligence or may amount to deliberate indifference. *Id.* Here, Harper generally alleges that Dr. Yu and Dr. Ali were aware of his serious medical condition and pain, but exhibited deliberate indifference by failing to examine his collarbone and by repeatedly failing to order an x-ray of his wrist or collarbone. Similarly, Harper generally alleges that Dr. Kapotas was aware of his serious medical condition and pain, yet exhibited deliberate indifference by failing to examine his collarbone and by repeatedly failing to order an x-ray of his collarbone. Whether their failure to act constitutes deliberate indifference depends on the extent of their knowledge of the risk of harm, which Harper need not specifically plead.

Moreover, the fact that Harper received some treatment does not preclude his claim because a finder of fact could infer that the care provided was so inadequate as to constitute intentional mistreatment. *Jervis v. Mitcheff*, 258 F.App'x 3, 6 (7th Cir. 2007). Harper alleges that 87 days passed between the time of his injury when he first saw either Dr. Yu or Dr. Ali and the time Dr. Kapotas ordered an x-ray of Harper's wrist. During that 87-day period, Harper filed numerous grievances and visited Dr. Yu and/or Dr. Ali on numerous occasions and neither doctor ordered an x-ray of Harper's wrist or collarbone or examined Harper's collarbone. Despite Harper's continual complaints of pain, Dr. Yu and Dr. Ali insisted Harper was fine. Based on these allegations, a finder of fact could infer that Dr. Yu and Dr. Ali "blinded" themselves to Harper's injuries by refusing to adequately investigate and diagnose his injuries and insisting that nothing was wrong with Harper. *See, e.g., Jervis*, 258 F.App'x at 6-7 (vacating dismissal because a finder of fact could conclude that the doctor blinded himself to the plaintiff's injuries by refusing to adequately investigate and diagnose the source of his pain and insisting nothing was wrong with plaintiff). For the same reason, a finder of fact could conclude that Dr. Kapotas acted with deliberate indifference toward Harper by failing to examine or x-ray his collarbone as of the date Harper filed his Complaint, which is more than a year after Harper sustained his injuries.

Accordingly, Harper alleges a plausible claim for relief against Dr. Yu, Dr. Ali, and Dr. Kapotas.

Defendants argue this case is similar to *Gutierrez v. Peters*, 111 F.3d 1364 (7th Cir. 1997). In *Gutierrez*, the plaintiff received treatment over a ten-month period and complained of an instance or two where he did not receive prompt treatment. *Id.* at 1374. The *Gutierrez* court found that the occasional delays were isolated instances of neglect which could not support a finding of deliberate indifference. *Id.* at 1375. Unlike in *Gutierrez*, here, Harper complains of the absolute lack of treatment of his collarbone and Dr. Yu's and Dr. Ali's failure to order an x-ray of Harper's wrist over the 87-day period after Harper sustained his injuries, despite Harper's constant complaints of pain. Thus, *Gutierrez* does not bear on this Court's decision.

## II. Count II Against Cermak, Dr. Puisis, and Dr. Hart

A plaintiff may sue a municipality or government employee, in his or her official capacity, under Section 1983 for a constitutional deprivation caused by the execution of an official policy or custom. *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 694 (1978). A plaintiff must show that the deprivation was caused by the enforcement of an express policy, by a widespread practice that is so permanent and well-settled that it constitutes a custom or practice, or by a person with final policy-making authority. *Estate of Sims ex rel. Sims v. Cnty. of Bureau*, 506 F.3d 509, 514-15 (7th Cir. 2007).

Defendants argue that this Court should dismiss Count II against Cermak, Dr. Puisis, and Dr. Hart (the "Cermak Defendants"), because Harper fails to state a Section 1983 claim against the municipality or government employees in their official capacities. The Cermak Defendants argue that Harper's boilerplate allegations of a policy or practice are insufficient to state a claim under Section 1983. Harper, however, alleges a laundry list of specific policies or practices, which caused the Cermak Defendants' deliberate indifference to Harper's medical needs.[1] For example, Harper alleges that the Defendants have an express policy or widespread practice of failing to provide timely treatment and discouraging or failing to employ adequate testing in response to medical complaints. Accordingly, Harper's allegations are sufficient to state a plausible claim for relief.[2]

The Cermak Defendants alternatively ask this Court to bifurcate Count II and defer discovery until after the completion of fact discovery in Count I. This Court denies the request, since the Cermak Defendants fail to address how bifurcation proves

---

[1] The Cermak Defendants also argue that Count II improperly alleges policies and practices only applicable to Defendant Sheriff Dart. The fact that every single allegation in Count II may not apply to the Cermak Defendants is irrelevant because Count II states a plausible claim for relief against the Cermak Defendants.

[2] While this Court cannot dismiss Count II, because Harpers states a plausible claim for relief, the Court acknowledges that Harper cannot recover punitive damages against the Defendants named in Count II. *Minix v. Canarecci*, 597 F.3d 824, 830 (7th Cir. 2010) (explaining that a plaintiff cannot recover punitive damages from a municipality or a government employee in his official capacity).

convenient to the parties, avoids prejudice to the parties, expedites the case, and economizes judicial resources.

## CONCLUSION

For the foregoing reasons, this Court denies Defendants' motion to dismiss.

_____
Charles P. Kocoras
United States District Judge

Dated:   May 3, 2011